**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHRISTOPHER HORN,

Plaintiff,

v. 1:24-cv-01457 (AMN/PJE)

G&H AUTO GROUP, INC. d/b/a MOHAWK CHEVROLET,

Defendant.

---

**APPEARANCES:** **OF COUNSEL:**

**HARDING MAZZOTTI, LLP** **KELLY A. MAGNUSON, ESQ.**
1 Wall Street
Albany, New York 12205
*Attorneys for Plaintiff*

**THE TOWNE LAW FIRM, P.C.** **JOHN W. LIGUORI, ESQ.**
500 New Karner Road **MEGAN L. BASSLER, ESQ.**
Albany, NY 12212
*Attorneys for Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I. INTRODUCTION

On December 2, 2024, Plaintiff Christopher Horn ("Plaintiff") commenced this action against G&H Auto Group, Inc., otherwise known as Mohawk Chevrolet ("Mohawk Chevrolet" or "Defendant"), alleging employment retaliation under Title VII and New York State law. Dkt. No. 1. Presently before the Court are cross-motions for summary judgment (the "Motions"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, by Mohawk Chevrolet, *see* Dkt. No. 30 ("Defendant's Motion"), and by Plaintiff, *see* Dkt. No. 34 ("Plaintiff's Motion"). Both Motions

have led to responses in opposition and replies in further support. *See* Dkt. Nos. 38, 41 (response and reply to Defendant's Motion); Dkt. Nos. 37, 42 (response and reply to Plaintiff's Motion).

For the reasons set forth below, the Court denies both Motions.

## II. BACKGROUND

Mohawk Chevrolet is a car dealership located in Ballston Spa, New York. Dkt. 37-2 at ¶ 6. From August 4, 2022, to January 10, 2023, Plaintiff was employed by Mohawk Chevrolet as a salesperson. *Id.* at ¶ 16, 18. Plaintiff's termination at the end of that period, eight days after he reported that a co-worker had been sexually harassed by a manager, is the subject of this lawsuit. In addition to Plaintiff, this case principally involves three individuals in management at Mohawk Chevrolet: co-owner Andy Guelcher ("Guelcher"), General Manager Travis Horne ("Horne"), and General Sales Manager Katie Duncan ("Duncan"). *See id.* at ¶¶ 8-15.

It is undisputed that when Plaintiff was hired by Mohawk Chevrolet in August of 2022, he directly negotiated an abnormally favorable pay plan with its co-owner, Guelcher. *Id.* at ¶¶ 20-21; Dkt. No. 38-1 at ¶¶ 10-11. The other salespersons at Mohawk Chevrolet were paid based on their meeting progressively increasing "tiers" of sales goals. Dkt. No. 30-12 at 44:21-45:13. If a vehicle sale was profitable enough, the salesperson would receive a certain percentage of the dealership's profits, with a higher percentage for more profitable deals—and if not, the salesperson received only a flat payment.[1] *See id.* at 44:21-45:13; Dkt. No. 34-13 at 29; Dkt. No. 38-1 at ¶ 9. Unlike

[1] More precisely, they earned commission compensation on the sale's "front end gross profits," which refer to the sale price of the vehicle less the price the dealership paid for the vehicle. *See* Dkt. No. 30-12 at 45:21-46:14. Back end gross profits, in contrast, refer to those made beyond the vehicle itself, such as on the customer's financing deal with the dealership. *See id.* at 105:22-106:10. Plaintiff not only received a guaranteed thirty percent commission on front end gross profits, he also received five percent on back end gross profits—an exceptionally profitable deal for him, since the back end gross profits could prove quite "stout." *Id.* at 105:11-15, *see* Dkt. No. 38-1 at ¶ 8.

those employees, Plaintiff made a guaranteed percentage at or above the top "tier" of the other salespersons, *regardless* of any individual car deal's profitability or his overall sales. *See* Dkt. No. 37-2 at ¶ 20; Dkt. No. 38-1 at ¶¶ 5-10; Dkt. No. 30-12 at 43:10-46:2. This made Plaintiff's compensation higher than all of Mohawk Chevrolet's other sales associates. *See* Dkt. No. 38-1 at ¶ 17.

But while this arrangement was comparatively favorable to Plaintiff, another aspect of his compensation led to friction between him and Mohawk Chevrolet. The disagreement arose over Plaintiff's commission compensation on holdbacks. Here, a "holdback" refers to a payment from the vehicle's manufacturer directly to the dealership on a car's sale. Dkt. No. 30-9 at 36:24-37:7. Every vehicle is sold to a dealership with a manufacturer-recommended final price. Dkt. No. 30-12 at 46:7-14. When the dealership sells that vehicle to an end customer, the manufacturer reimburses some percentage of the recommended final price back to the dealership to help cover general and administrative expenses. *See id.* at 105:16-106:3. But while the dealership profits from both the vehicle sale and the holdback payment, a salesperson is typically paid commission only on the sale, not on the holdback. *See* Dkt. No. 38 at ¶ 4; Dkt. No. 30-9 at 37:4-5.

Plaintiff wanted to be paid on both his vehicle sales and the associated holdback payments. Dkt. No. 30-9 at 37:2-3. Accordingly, he requested as much when he joined Mohawk Chevrolet. Dkt. No. 38-1 at ¶ 2. The parties now dispute whether Mohawk Chevrolet accepted or declined that request. *Id.* at ¶ 7. What they do not dispute, however, is that Plaintiff *was* paid on holdbacks until December 2022. *Id.* at ¶ 14. Mohawk Chevrolet contends that this was overpayment due to an "accounting error," which was corrected when it was uncovered. *Id.* at ¶ 14. Afterwards, Mohawk Chevrolet told Plaintiff that his compensation would no longer include payment on holdbacks moving forward, though they permitted him to "retain the overpayment and . . . did not

request that Plaintiff pay it back." *Id.* at ¶ 15-17. Plaintiff disagrees with this characterization, contending that Mohawk Chevrolet reneged on his agreement with Guelcher that he would be paid on holdbacks. Dkt. No. 37-2 at ¶ 26. When he was informed that he would no longer be paid on holdbacks, he proceeded to raise the issue with General Sales Manager Duncan—who he believed had ordered the change in his pay, *see* Dkt. No. 30-9 at 50:19-51:16—and they scheduled a meeting for January 2, 2023, to discuss the issue.[2] Dkt. No. 37-2 at ¶¶ 27-30.

Up to this point in his employment, Mohawk Chevrolet contends that Plaintiff had several "performance deficiencies," which Plaintiff disputes. Dkt. No. 38-1 at ¶¶ 19-25. Though Plaintiff was never the subject of an "official write-up," Duncan testified that managers "had issues with him not abiding with what the sales consultants were supposed to do on a day-to-day." Dkt. No. 30-12 at 21:4, 21:17-23. Specifically, Duncan contends that Plaintiff was not conducting sufficient client and social media outreach, *see id.* at 22:2-24:5, and not properly logging phone calls with customers, *see id.* at 28:3-11. Duncan testified that Plaintiff received multiple "corrective conversations" that did not result in him fixing those issues. *Id.* at 30:13-23. But no contemporaneous documentation of those corrective conversations is in the record, Dkt. No. 37-2 at ¶ 89, and Plaintiff testified that he did not recall being counseled or disciplined for his insufficient phone contacts. Dkt. No. 30-9 at 45:7-16, 60:15-17. Further, Duncan's recollection is only partially supported by the testimony of other Mohawk Chevrolet employees. *Compare* Dkt. No. 30-11 at 20:3-7 ("[Plaintiff] had . . . numerous meetings with [General Manager] Mr.

[2] Mohawk Chevrolet contends that "[P]laintiff regularly complained to management about his pay structure," and that during his "short time of employment, multiple meetings were held between Plaintiff and management to discuss Plaintiff's ongoing pay issues." Dkt. No. 38-1 at ¶¶ 11-12. But, aside from a promptly resolved misunderstanding about his pay structure at the beginning of his employment, the record does not identify a pattern of disputes regarding Plaintiff's compensation prior to December of 2022. *See id.* at ¶ 12 (Plaintiff's response).

[Horne], Ms. [Duncan] regarding performance and attitude on the job.") *with* Dkt. No. 34-10 at 22:15-18 (statement of Horne that "[n]ot to my knowledge" had there been discipline of Plaintiff). Plaintiff also notes that the managers of Mohawk Chevrolet called him the "highest rated salesman" at the dealership in a performance review one week before his termination, *see* Dkt. No. 30-9 at 126:1-5, and he further points out that up until a few days before his termination Guelcher made posts on social media praising his work, Dkt. No. 37-2 at ¶ 24; Dkt. No. 38-3 at 27.

More significantly, prior to the January 2, 2023 meeting Plaintiff learned that a female co-worker ("J.T.") was alleging that a manager ("J.E.") had sexually harassed her.[3] J.T. spoke to Plaintiff sometime "[c]lose to that [January 2, 2023] meeting somewhere," Dkt. No. 30-9 at 61:17-18, and showed him a text message from J.E. offering to help her get a new car, but asking "what are you going to do for me?"[4] *Id.* at 130:13-17. Both J.T. and her boyfriend at the time ("J.G."), another employee at Mohawk Chevrolet, told Plaintiff that J.E. had attempted to bring J.T. into a closet on the second floor of their workplace. *Id.* at 64:8-13. J.T. said to Plaintiff that she was "very nervous, very scared," "afraid to come to work," and "afraid she would lose her job for reporting it" because "[Duncan] is friends with the manager that was doing it to her." *Id.* at 62:2-10.

---

[3] The Court refers to the non-party alleged harasser and victim using their initials.

[4] Both parties repeatedly object to certain statements as inadmissible hearsay, and accordingly contend that they may not be considered by the Court in deciding these Motions. Fed. R. Civ. P. 56(c)(2); *see*, *e.g.*, Dkt. No. 37-2 at ¶ 54; Dkt. No. 38-1 at ¶ 32; Dkt. No. 41-1 at ¶ 35. The Court will not explain why each objection relating to the evidence discussed in this Section is meritless, and will instead note that statements made by an opposing party's agent or employee on a matter within the scope of their employment are not hearsay, *see* Fed. R. Evid. 801(d)(2)(D), and statements offered for their effect on the listener—such as to explain an employer's firing decision, or an employee's decision to report sexual harassment—are also not hearsay, *see United States v. Rowland*, 826 F.3d 100, 115 (2d Cir. 2016).

Then, on January 2, 2023, during the meeting on Plaintiff's pay with Duncan and dealership General Manager Horne, all the parties agree that Plaintiff revealed J.T.'s allegations for the first time. Dkt. No. 37-2 at ¶ 31. Horne and Duncan both testified that Plaintiff raised the sexual harassment allegations as a non-sequitur in the middle of what they viewed as an unrelated discussion about his compensation. Dkt. No. 34-10 at 36:18-37:5; Dkt. No. 30-12 at 59:22-60:5. Until Plaintiff began discussing the sexual harassment allegations, the focus of the meeting had been Duncan and Horne informing Plaintiff that he would no longer be paid on holdbacks going forward. Dkt. No. 38-1 at ¶ 27. Both Plaintiff's testimony and Duncan's written notes suggest that Plaintiff then complained about Duncan's management style, and raised J.T.'s sexual harassment allegations in support of these complaints. Plaintiff testified that during the meeting:

> It started getting a little tense with [Duncan] and I and we talked about . . . how sometimes she can intimidate employees. . . . [Duncan] disputed that she intimidates people. I said yes there's a young lady working in the office that's currently getting sexually harassed by a man[a]ger and she's afraid to report it because she thinks you're going to fire her if you do because you[']r[e] friends with the manager. At that point [Duncan] stood up like angrily and called me a fucking liar.

Dkt. No. 30-9 at 58:14-59:1. Duncan's notes state:

> [Plaintiff] mentioned as an example of how I treated him poorly that I "rolled my eyes" at him when he wanted to discuss comp. . . . I asked [Plaintiff] for more examples of how I possibly treated him poorly . . . . and [Plaintiff] proceeded to throw out that there was sexual harassment at the dealership and that [Horne] and I didn't know about it because the female was too scared to come forward because of ME and that she feared retaliation. After [Plaintiff] explained the situation and who it was involving, I don't even oversee the female.

Dkt. 30-12 at 124.

After revealing the sexual harassment allegations, Plaintiff testified that he told Duncan and Horne that J.T. had received a text message from J.E., *see* Dkt. No. 30-9 at 61:10-18, stating "[s]omething to the effect that we'll get you a new car but, you know, what are you going to do

for me?" *Id.* at 130:13-17. Duncan did not believe that Plaintiff discussed text messages, but agreed that he stated J.E. had asked J.T. "what are you going to give me for it if I give you the deal[?]" Dkt. No. 30-12 at 63:3-18. Plaintiff also testified that he told Duncan and Horne that J.E. tried to physically push or pull J.T. into a closet at work with him, Dkt. No. 30-9 at 130:1-7; Dkt. No. 37-2 at ¶ 33, but Duncan denied that Plaintiff mentioned any such incident, Dkt. No. 30-12 at 62:22-63:2. Horne only recalled that Plaintiff identified J.T. as a victim of sexual harassment, not the substance of any allegations, and testified that the meeting ended a few minutes after the discussion turned to the allegations. Dkt. 34-10 at 37:6-39:3, 41:3-19.

Richard Michaud, Mohawk Chevrolet's director of human resources at the time of this incident, then initiated an investigation of the alleged sexual harassment. Michaud learned of Plaintiff's report from Duncan and Horne, *see* Dkt. No. 30-11 at 32:5-34:17, and then learned from an interview with Plaintiff "that [J.T.] had shown him a text. [Plaintiff] would not elaborate on what the text was, but he felt that it was potentially . . . out of line," *Id.* at 36:11-15. Michaud then met with alleged victim J.T. Afterwards, Michaud wrote that J.T. said J.E. sent "some inappropriate texts and that [J.T.] had ignored them and had not responded to any of them." *Id.* at 84. Michaud also wrote that J.T. said Plaintiff "pull[ed] her aside and explained that he was in a difficult conversation with management about other topics related to him, felt backed into a corner, and threw this out to deflect the unrelated items they were discussing." *Id.* at 84-85. Michaud's notes conclude that "[J.T.] did not want me to pursue the matter with [J.E.] . . . . she was more embarrassed and disappointed that [Plaintiff] brought it up, than anything with the text messages." *Id.* at 85. Michaud never spoke with J.E. regarding the allegations. *See* Dkt. No. 37-1 at ¶ 47. He "concluded the investigation" based on J.T.'s request that it not proceed. Dkt. No. 30-11 at 46:6-17; *see also* Dkt. No. 37-1 at ¶¶ 48-49. Guelcher testified that he was later told the matter "was

investigated and unfounded." *Id.* at ¶ 49.

A few days after Plaintiff spoke with Michaud, he was called into a meeting with Duncan and Horne where it is undisputed he was told not to speak about J.T.'s allegations any further. *See* Dkt. No. 38-1 at ¶ 49; Dkt. No. 30-9 at 75:3-6. Plaintiff testified that Horne and Duncan simply told him to "never bring . . . up" J.T.'s sexual harassment allegations again. *Id.* at 75:9-10. Duncan testified that the meeting came about because both J.T. and J.E. had complained that talk about the allegations was "all over the sales floor." Dkt. No. 30-12 at 67:3-12. Duncan believed that Plaintiff spoke with other sales consultants about the allegations because other employees "were hearing [about] this from somebody," though she only testified to having personal knowledge of Plaintiff discussing it with J.G. *Id.* at 69:12-71:11. Horne testified that "there were rumors that [Plaintiff] was going around, like, preparing the people, like hey, you know, HR is going to talk to you, I started this." Dkt. No. 34-10 at 49:6-13. Duncan and Horne met with Plaintiff and told him "this needs to stop being talked about. This is private business of people. It is in our HR department's hands. It is making people feel uncomfortable."[5] Dkt. No. 30-12 at 67:14-18.

An email Duncan sent to Michaud on January 9, 2023, further suggests that Mohawk Chevrolet's management was concerned about Plaintiff's motive for making the complaint and his discussing it with other employees. Relaying a discussion she had with J.G., Duncan wrote:

> [J.G.] is not happy with [Plaintiff] and the fact that he brought this up and used it as a 'trump card', as he kept saying. [J.G.] said that [Plaintiff] told him he was backed into a corner and needed to throw something out as a 'fuck you', to [Horne] and I about how things are here to divert from himself.

[5] Mohawk Chevrolet's sexual harassment policy states it "will keep the investigation confidential to the extent possible," and that the "policy applies to all employees, paid or unpaid interns, and non-employees and all must follow and uphold this policy." Dkt. No. 30-8 at 11. The parties contest whether the confidentiality provision applies only to Mohawk Chevrolet and its conduct of an investigation, or whether it also applied to Plaintiff to prevent him from discussing the sexual harassment allegations. Dkt. No. 41-1 at ¶ 36.

*Id.* at 122. On January 9, 2023, *see* Dkt. No. 30-9 at 132:13-15, the day before his termination, Plaintiff testified that Guelcher reprimanded him for reporting J.T.'s sexual harassment:

> **Plaintiff:** We were talking about having a meeting. I wanted to, you know, talk about the pay situation with [Guelcher] since he was back in the office.
> **Q:** And in that conversation did Mr. Guelcher bring up the fact that you had disclosed the sexual harassment?
> **Plaintiff:** He did.
> **Q:** Okay. And in what context did he bring that up?
> **Plaintiff:** Like disappointed in me. He's like why did I bring up the [J.T.] and [J.E.] thing he said.

*Id.* at 77:12-22. Plaintiff later testified:

> **Plaintiff:** His tone was like why did you do that? Now I have to do something about it. That's how I took it. You know, . . . almost like I went against the . . . team by . . . reporting it.

*Id.* at 132:23-133:2. For his part, Guelcher did not recall speaking to Plaintiff about the "[J.E.] and [J.T.] thing." Dkt. No. 30-15 at 29:14-18.

Also on that same day, January 9, 2023, it is undisputed that Plaintiff left work for several hours and met with the general manager of a competing automobile dealership, Latham Ford. Plaintiff told a manager at Mohawk Chevrolet that he had a "family situation," and he then left work without identifying a time when he would return. Dkt. No. 38-1 at ¶¶ 50-51. Plaintiff then went to Latham Ford to speak with its general manager, who had been trying to recruit Plaintiff for years, and who knew that Plaintiff was unhappy with his compensation at Mohawk Chevrolet. *See id.* at ¶¶ 54-55. Duncan's notes indicate that Mohawk Chevrolet management "got word from an employee . . . [Plaintiff] went to Latham Ford to do an interview," and "[Guelcher] mentioned this to [Plaintiff,] and he confessed that he was out at an interview[.]" Dkt. No. 30-12 at 125. Plaintiff contends that he was "in fear he was going to lose his job after reporting the harassment, which is why he contacted . . . Latham Ford." *See* Dkt. No. 37-2 at ¶ 58.

The next day, January 10, 2023, Plaintiff attended a meeting at Mohawk Chevrolet that he

believed would be about the "holdback money" issue—but where he was terminated. Dkt. No. 30-9 at 78:2-16. The record of this meeting is sparse, and the only substantive account of what occurred comes from Plaintiff. Plaintiff testified that he met Horne and Guelcher in Horne's office. *See id.* at 79:2-6. Guelcher told Plaintiff that Mohawk Chevrolet had made a final determination he would no longer be paid on holdbacks, and because Guelcher knew Plaintiff would be unhappy about his compensation it would be "better off that [Plaintiff] leave and not work for them anymore." *Id.* at 79:12-15. Plaintiff replied that he would "deal with the . . . pay change and [he] want[ed] to continue working" at Mohawk Chevrolet. *Id.* at 85:15-17. Guelcher and Horne then sent Plaintiff out of the room to confer, and during this time Plaintiff observed "Duncan just staring at me smirking and smiling like she knew what was going on." *Id.* at 80:9-11. Then Guelcher called Plaintiff back in and told him "you're not going to be happy after we change your pay. It's better if you don't work here. . . . He told me [that] because of the pay they were letting me go because I wasn't going to be happy." *Id.* at 86:16-22.

In contrast, Mohawk Chevrolet provides almost no direct evidence as to what occurred during the January 10, 2023 meeting. Mohawk Chevrolet's witnesses do not even agree as to who participated in the meeting. In Plaintiff's account, he spoke to Guelcher and Horne, and it was Guelcher who stated that Plaintiff was terminated because of the ongoing compensation dispute. *See id.* at 79:2-6, 86:16-22. But Guelcher testified he was not at the meeting, did not know who informed Plaintiff that he was terminated, and did not "remember anything about [Plaintiff's] termination. I wasn't involved with that." Dkt. No. 30-15 at 29:21-30:4. Horne remembered terminating Plaintiff, but he testified that he and Duncan—not Guelcher—were the ones present at the January 10, 2023 meeting, Dkt. No. 34-10 at 50:17-24, he did not "remember the details from the meeting," *Id.* at 50:10-13, and though he believed that Duncan made the decision to

terminate Plaintiff, he did not recall why that decision was made or what was communicated to Plaintiff about it. *Id.* at 50:25-52:12. Similarly, Duncan testified that she did not know why Plaintiff was fired, and further testified that she was neither involved in the decision to terminate him nor at the meeting in which he was terminated. *See* Dkt. No. 30-12 at 98:14-101:14. Duncan's notes simply state "[Plaintiff] was terminated by [Horne] and [Guelcher] in [Guelcher's] office," without any further detail. *Id.* at 125.[6]

Following Plaintiff's termination, he filed a charge with the Equal Employment Opportunity Commission ("EEOC") on May 4, 2023, alleging violations of Title VII. Dkt. No. 37-2 at ¶ 3. On September 6, 2024, the EEOC issued Plaintiff a right to sue letter. *Id.* at ¶ 3; *see* Dkt. No. 1-1. This litigation commenced shortly thereafter. Dkt. No. 1.

## III. STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). The court first determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June

[6] Tellingly, in their statement of material facts, Mohawk Chevrolet cite to *Plaintiff's account* of the January 10, 2023 meeting to assert that Plaintiff was fired because of the ongoing pay dispute. *See* Dkt. No. 38-1 at ¶ 58.

24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

A movant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249-50).

## IV. DISCUSSION

Plaintiff asserts a retaliation claim against Mohawk Chevrolet under Title VII and the New York State Human Rights Law ("NYSHRL"). Dkt. No. 1 at ¶¶ 26-41. Title VII and the NYSHRL prohibit employers from retaliating against an employee for opposing an unlawfully discriminatory practice. *Zheng-Smith v. Nassau Health Care Corp.*, No. 20-cv-3544, 2021 WL 4097316, at *3 (2d Cir. Sept. 9, 2021) (citing 42 U.S.C. § 2000e–3(a); N.Y. Exec. L. § 296(7)). "Retaliation claims under Title VII and the NYSHRL . . . are analyzed under the *McDonnell Douglas* burden-shifting framework." *Id.* (citing *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013)); *see McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 66 (S.D.N.Y. 2020) ("The same

standards govern retaliation claims under Title VII and the NYSHRL."). "To make out a *prima facie* case of retaliation, a plaintiff must make four showings: that (1) []he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against [him]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Ferrando-Dehtiar v. Anesthesia Grp. of Albany, P.C.*, 727 F. Supp. 3d 165, 190 (N.D.N.Y. 2024) (quoting *Summa*, 708 F.3d at 125). "If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to demonstrate that a legitimate, non-retaliatory reason existed for its action." *Cusher v. Mallick*, No. 16-cv-1273, 2020 WL 109510, at *20 (N.D.N.Y. Jan. 9, 2020) (citing *Summa*, 708 F.3d at 129). "If the employer demonstrates a legitimate, non-retaliatory reason for the adverse employment action, the burden shifts back to the plaintiff to show 'that the desire to retaliate was the but-for cause of the challenged employment action.'" *Hellwig v. Cnty. of Saratoga*, No. 22-cv-488, 2024 WL 3791238, at *8 (N.D.N.Y. Aug. 13, 2024) (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

In seeking summary judgment, Plaintiff describes this as a "textbook case of unlawful retaliation." Dkt. No. 34-1 at 5. He notified Mohawk Chevrolet about a co-worker who was being sexually harassed by a manager, and eight days later he was terminated. *Id.* at 5. During those eight days, the same managers to whom he reported the allegations told Plaintiff to "never bring it up again," Dkt. No. 30-9 at 75:9-10, and the co-owner of Mohawk Chevrolet asked Plaintiff why he had "brought up" the "thing" involving the allegedly harassed employee, *id.* at 77:12-22—before personally terminating Plaintiff the next day, *see id.* at 86:16-22. For its part, Mohawk Chevrolet raises several grounds that it contends require summary judgment, including that an improper motivation behind Plaintiff's sexual harassment report prevents it from being protected activity; that prima facie causation is defeated because, among other things, Plaintiff had

previously been chastised about performance deficiencies; and, finally, that Mohawk Chevrolet has presented a legitimate and non-discriminatory reason for terminating Plaintiff. *See generally* Dkt. Nos. 30-17, 41.

**A. Protected Activity and Employer Awareness**

Both Title VII and the NYSHRL bar an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a); *see* N.Y. Exec. Law § 296. Sexual harassment that creates a "hostile or abusive work environment" is a "form of gender discrimination prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986)). And "'[w]hen an employee communicates to [their] employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's *opposition* to the activity.'" *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (quoting 2 EEOC Compliance Manual §§ 8–II–B(1), (2), p. 614:0003 (Mar. 2003)); *see also Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) ("[P]rotected activities are not limited to complaints involving discrimination against the complainant [himself], but also extend to complaints of discrimination on behalf of other employees.").

Mohawk Chevrolet does not dispute that J.E.'s alleged treatment of J.T. constitutes sexual harassment creating a hostile work environment, nor does it dispute that Plaintiff's complaint made Mohawk Chevrolet aware of that activity. *See* Dkt. No. 30-17 at 9-11. Instead, Mohawk Chevrolet argues that Plaintiff's opposition to J.T.'s sexual harassment did not come from a "good faith,

reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (internal quotation omitted). Mohawk Chevrolet principally contends that the circumstances "indicate that Plaintiff raised the allegations only for his own benefit," and accordingly his conduct is not statutorily protected. Dkt. No. 30-17 at 16. According to Mohawk Chevrolet, Plaintiff strategically delayed reporting J.T.'s harassment allegations until the January 2, 2023 meeting regarding his compensation. *See id.* at 15-16. And then, he only raised it as a "trump card" because he felt "backed into a corner" once he realized his pay would no longer include compensation on holdbacks. *See* Dkt. No. 30-12 at 122, Dkt. No. 30-11 at 84-85. Accordingly, Mohawk Chevrolet argues that "it cannot be said that the Plaintiff made the complaint in good faith," and thus the retaliation claim is barred. *See* Dkt. No. 30-17 at 15.

This argument fails because it misapprehends retaliation law. Mohawk Chevrolet contends that Plaintiff's motivations for notifying his supervisors of the sexual harassment allegations strip his opposition to unlawful conduct of protection. But typically, if an employee has a "good faith, reasonable belief" that an employer action is unlawful under Title VII and the NYSHRL and they oppose it, they are protected from retaliation under both even if the underlying employer action is, in fact, lawful. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (quoting *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir.1999)); *see Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 46 (2d Cir. 2025) (applying the same test to Title VII and the NYSHRL). Where the good faith, reasonable belief requirements are satisfied, "an employment practice need not actually violate Title VII for the protected activities element of a retaliation claim to be satisfied." *McMenemy v. City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001).

Mohawk Chevrolet takes a test meant to expand retaliation protection to employees who

mistakenly oppose a *lawful* employer practice, and asks the Court to use it to withdraw protection from an employee who opposed an *unlawful* practice. While Mohawk Chevrolet correctly states that a retaliation claim is not a "tactical coercive weapon that may be turned against the employer as a means for the asserted victims to advance their own retaliatory motives and strategies," it misunderstands what that language means. *Wolf v. Time Warner, Inc.*, 2011 WL 856264, at *8 (S.D.N.Y. Mar. 3, 2011) (quoting *Spadola v. New York City Transit Auth.*, 242 F. Supp. 2d 284, 292 (S.D.N.Y. 2003)). What animates the "good faith, reasonable belief" test is not a requirement that every report of sexual harassment arise from motives that are above reproach, but instead an interest in stopping employees from "extract[ing] employment concessions on account of minor social lapses or harmless infractions in the workplace, or even . . . escap[ing] appropriate disciplinary measures." *Spadola*, 242 F. Supp. 2d at 292. Accordingly, what courts assess is not whether a plaintiff was motivated by some abstract "good faith" in making their complaint, but rather whether the plaintiff believed in good faith that "the conduct he opposed ran afoul *of one of [Title VII's or the NYSHRL's] particular statutory proscriptions*." *Cooper v. New York State Dep't of Lab.*, 819 F.3d 678, 681 (2d Cir. 2016) (emphasis added). This is why every single opinion Mohawk Chevrolet cites turns on plaintiffs either lacking an objectively good faith or subjectively reasonable belief that their employer was engaging in prohibited discrimination.[7]

[7] *See*, *e.g.*, *Spadola*, 242 F. Supp. 2d at 284 (plaintiff's testimony "belies that at the time the incident occurred he actually believed he had been a victim of sexual harassment"); *Denigro v. Mary Imogene Bassett Hosp.*, 2016 WL 6652777, at *3 (N.D.N.Y. Sept. 9, 2016) ("[N]o reasonable person could have believed that Plaintiff's supervisor's single sexually demeaning remark (and hand gesture) about a female event attendee was unlawful under Title VII."); *Sullivan-Weaver*, 114 F. Supp. 2d at 242-43 (holding that because an employer's preference for a paramour is not cognizable discrimination, a complaint based on it is not "characterized by *objective* good faith"); *Wolf*, 2011 WL 856264, at *8 (rejecting an argument that a plaintiff's discrimination complaint made "in response to performance-based criticism" was not in good faith because the underlying claim of discrimination was plausible); *Yeger v. Inst. of Culinary Educ., Inc.*, 2017 WL 377936, at *15 (S.D.N.Y. Jan. 25, 2017) ("None of the actions cited by Plaintiff . . . constituted protected

Here, plaintiff learned that his co-worker had alleged that she was subject to inappropriate contact and harassing text messages by her manager, reported it to Mohawk Chevrolet's general manager and general sales manager, and then gave an interview about it to the director of human resources. Mohawk Chevrolet does not argue that Plaintiff had inadequate knowledge of the sexual harassment, that he could not have reasonably believed it was prohibited by Title VII or the NYSHRL, or that the underlying sexual harassment was not gender discrimination prohibited by statute. Accordingly, the Court declines to hold that Plaintiff's activities were not protected activity under Title VII and the NYSHRL.

### B. Causal Connection Between Protected Activity and Adverse Employment Action

There is no question that Plaintiff's termination constituted both an "adverse employment action" under Title VII and "conduct that was reasonably likely to deter a person from engaging in" protected activity under the NYSHRL. *Edelman*, 141 F.4th 28, 45–46 (2d Cir. 2025). But to make out a prima facie case, Plaintiff must show "a causal connection between the protected activity and [that] adverse action."[8] *Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007). Proof of a causal relationship between protected activity and adverse action can be established "either (1) 'directly, through evidence of retaliatory animus' toward the plaintiff, or (2) 'indirectly,' through 'circumstantial evidence.'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 239 (2d Cir. 2024)

---

activity for the purposes of her retaliation claims."); *Tang v. Glocap Search LLC*, 2015 WL 5472929, at *3 (S.D.N.Y. Sept. 16, 2015) (holding that a jury was entitled to find that plaintiff "cynically generate[d] a paper trail to support a later claim of discrimination," and thus did not subjectively believe "that Defendants had engaged in discrimination").

[8] Title VII imposes a "but-for" causation test, while the NYSHRL only requires plaintiffs to establish the retaliatory animus "was a motivating factor" in the challenged conduct. *See Edelman*, 141 F.4th at 49-52. Because the Court finds prima facie causation established under Title VII's more demanding standard, "it necessarily would also satisfy the lower 'motivating factor' standard." *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 333 n.7 (S.D.N.Y. 2020).

(quoting *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)). Circumstantial evidence can include "[c]lose temporal proximity between the plaintiff's protected action and the employer's adverse employment action," which "may in itself be sufficient to establish the requisite causal connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010); *see Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023).

Only eight days separated Plaintiff's sexual harassment report and his termination. Dkt. No. 34-1 at 5. This close temporal proximity alone is well within the bounds of what the Second Circuit has said provides strong circumstantial evidence of a causal relationship between the two events. *See*, *e.g.*, *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (finding causation established by, "among other things, evidence that the time between the plaintiff's initial complaint and her discharge was a mere twelve days"); *see also Banks*, 81 F.4th at 278 (2d Cir. 2023) (finding a period of "approximately six months . . . fits within the range of time that we have held can support a reasonable inference of causation"); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) (finding a gap of "four months . . . . sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"). However, Mohawk Chevrolet rightly notes that where "timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). Accordingly, Mohawk Chevrolet contends, because the record contains evidence of "performance deficiencies" by Plaintiff

predating his sexual harassment report—related to his client and social media outreach and his logging of customer contacts—he has failed to show causation.[9] *See* Dkt. No. 38-1 at ¶¶ 19-25.

But two disputed issues of fact prevent Mohawk Chevrolet from prevailing on this argument. First, a reasonable factfinder could doubt Mohawk Chevrolet's thin record on performance deficiencies and discipline. While Mohawk Chevrolet presents testimony that Plaintiff was subject to "corrective conversations" by his managers to address performance issues, Dkt. No. 30-11 at 30:13-23, it does not support that testimony with contemporaneous documentation of reprimands, training, or discipline. *See* Dkt. No. 37-2 at ¶ 89. This is despite testimony from Mohawk Chevrolet's director of human resources that there "would have definitely" been notes memorializing those conversations. *See* Dkt. No. 41-1 at ¶ 29. Further, the other manager allegedly involved in disciplining Plaintiff had no recollection of it. *See* Dkt. No. 34-10 at 22:15-18. And, finally, Plaintiff disputes that he was counseled or disciplined for the primary performance issue Mohawk Chevrolet identified.[10] *See* Dkt. No. 30-9 at 45:10-15, 60:15-17.

Second, a reasonable factfinder could find that statements and actions by Mohawk Chevrolet's managers provide direct evidence of causation supplementing the circumstantial

---

[9] Mohawk Chevrolet also contends that (1) the dispute regarding Plaintiff's compensation plan, or (2) his violation of the confidentiality requirements around the sexual harassment allegation could defeat his case of prima facie causation. *See* Dkt. No. 41 at 9-10. Both arguments are meritless. *Slattery* asks the Court to look for "gradual adverse job actions" which began "well before" the protected activity. 248 F.3d at 95. As to the pay dispute, the record contains nothing resembling adverse action prior to Plaintiff's pay cut approximately one month before his termination, which was neither "gradual" nor "well before" the sexual harassment report. And as to Plaintiff's alleged breach of confidentiality policies during the sexual harassment investigation, any such misconduct or discipline plainly cannot have occurred prior to his protected activity initiating the investigation.

[10] Even if the record of discipline was undisputed, there would still be a material issue of fact as to whether the firing itself was "part of, or the culmination of, a disciplinary process that was already underway." *Hardy v. Rochester Genesee Reg'l Transp. Auth.*, 906 F. Supp. 2d 178, 185 (W.D.N.Y. 2012).

evidence of temporal proximity. For example, statements by Mohawk Chevrolet's managers indicate that they responded to Plaintiff's sexual harassment report by calling him a "fucking liar," *id.* at 58:14-59:1, and assumed that he had used the sexual harassment complaint as a "fuck you" to management, Dkt. No. 30-12 at 122. In the days after reporting the sexual harassment, it is undisputed that Plaintiff was called into a meeting with Duncan and Horne and told to stop talking about J.T.'s sexual harassment complaint. *See* Dkt. No. 30-9 at 75:3-6; Dkt. No. 30-12 at 67:14-18. And Plaintiff testified that the day before he was terminated the same Mohawk Chevrolet co-owner who later fired him asked him "why did you bring up" the sexual harassment allegations, Dkt. No. 30-9 at 77:12-22, in a tone that suggested it was "almost like [Plaintiff] went against the . . . team by . . . reporting it," *id.* at 132:23-133:2. Mohawk Chevrolet's investigation itself could support a causation inference, as it was concluded within a week, on the day before Plaintiff was fired, without even speaking to the alleged sexual harasser, *see* Dkt. No. 37-1 at ¶ 47-49; *see also Kozak v. Off. Depot, Inc.*, 2025 WL 1425916, at *2 (W.D.N.Y. May 16, 2025) (holding that evidence of a "woefully inadequate" sexual harassment investigation helped defeat summary judgment on retaliation). A reasonable factfinder could conclude that some or all of this evidence suggests that Plaintiff's managers held sufficient animus against him for reporting the sexual harassment to terminate his employment. Accordingly, the Court declines to grant summary judgment on prima facie causation.

### C. Legitimate, Non-Discriminatory Reason

If an employee establishes a prima facie case of retaliation, the employer "can then 'articulate some legitimate, non-retaliatory reason for' firing" them, thereby requiring the plaintiff to "prove that h[is] protected activity 'was a 'but-for' cause of' h[is] firing, which []he can do by showing that [the employer]'s proffered reason is pretextual." *Knox v. CRC Mgmt. Co., LLC*, 134

F.4th 39, 49 (2d Cir. 2025) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845-46 (2d Cir. 2013)). The Second Circuit has observed that "[o]rdinarily, plaintiff's evidence establishing a prima facie case and defendant's production of a nondiscriminatory reason for the employment action raise a question of fact to be resolved by the factfinder after a trial." *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir. 2000). The Court concludes that is the case here. After accounting for disputed issues of material fact and viewing the evidence in the light most favorable to each party in turn, the Court must decline to grant summary judgment for either.

First, Mohawk Chevrolet contends that it has articulated a legitimate and non-retaliatory reason that it terminated Plaintiff, which Plaintiff has failed to rebut. *See* Dkt. No. 30-17. And Mohawk Chevrolet has offered several potentially legitimate and non-discriminatory reasons. On this record, the most well supported is the matter of Plaintiff's compensation that precipitated the meeting where he reported the sexual harassment allegation. Dkt. No. 38-1 at ¶ 27.

While the parties dispute whether Plaintiff was entitled to additional pay on holdbacks, a reasonable factfinder could find that Mohawk Chevrolet's docking his compensation caused a breakdown in the parties' employment relationship. One month before his termination, Mohawk Chevrolet ended a compensation arrangement that made Plaintiff the best paid salesman at the dealership. Dkt. No.38-1 at ¶ 14. Plaintiff viewed this change in his compensation as Mohawk Chevrolet violating the terms of his employment, and he raised the issue to management. Dkt. No. 37-2 at ¶ 26. Plaintiff testified that after he was informed by Duncan that he would no longer be paid on holdbacks, his interaction with her and Horne "started getting a little tense." Dkt. No. 30-9 at 58:14. Plaintiff believed that Duncan had ordered the reduction in his pay, *see id.* at 50:19-51:16, and the record supports an inference that he raised the sexual harassment allegations as a responsive criticism of her management, s*ee id.* at 58:14-59:1; Dkt. No. 30-12 at 124. Mohawk

Chevrolet viewed Plaintiff's allegations as a "trump card" that Plaintiff had used to redirect attention from a negotiation that was not going his way.[11] *See* Dkt. No. 30-12 at 122. Just a week later—the day before he was fired—Plaintiff left work in the middle of the day and met with the general manager of a rival automobile dealership that had been attempting to recruit him. *See* Dkt. No. 38-1 at ¶¶ 54-55. And Plaintiff testified that when he was terminated management provided him with this rationale: that "because of the pay they were letting me go because I wasn't going to be happy." Dkt. No. 30-9 at 86:16-22.

But while the compensation dispute is a legitimate and non-retaliatory reason for Plaintiff's termination, Mohawk Chevrolet cannot win summary judgment on it—or any other legitimate and non-retaliatory reason—in part because Mohawk Chevrolet has failed to provide admissible evidence going directly to the exact reason(s) Plaintiff was terminated. A plaintiff may challenge a legitimate reason as pretextual by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan*, 737 F.3d at 846. Here, there are readily apparent weaknesses and implausibilities. Crucially, of the three managers who may have determined Plaintiff would be fired, none testified to actually making the decision to fire him. *See* Dkt. No. 30-15 at 29:21-30:4; Dkt. No. 34-10 at 50:10-13; Dkt. No. 30-12 at 98:14-101:14. This combines with evidence potentially undermining the compensation dispute justification and the other offered reasons, such as Plaintiff's testimony

---

[11] It may well be that on this theory Mohawk Chevrolet's management assessed the sexual harassment complaint in the light of the escalating pay disagreement and fired Plaintiff in part for his using it as a "trump card" negotiating tactic. Accordingly, the issue of whether Plaintiff's firing was due to his sexual harassment report would be "uncomfortably close and almost inextricably interwoven with the issue of whether" he was fired because of the compensation dispute. *Tavano v. Niagara Cnty., New York*, 621 F. Supp. 345, 350 (S.D.N.Y. 1985). But disentangling these motivations "requires that evidence be weighed and inferences drawn, tasks that our legal system properly delegates to a jury." *Herbert Const. Co. v. Cont'l Ins. Co.*, 931 F.2d 989, 997 (2d Cir. 1991)

that he told Mohawk Chevrolet he would "deal with the . . . pay change and [he] want[ed] to continue working." Dkt. No. 30-9 at 85:15-17. Together with Plaintiff's direct evidence discussed *supra* Section IV.B, including the conduct of the investigation and statements by managers reprimanding him for reporting the sexual harassment, the Court must conclude that disputed issues of fact prevent summary judgment for Mohawk Chevrolet.[12]

But that does not mean that Plaintiff's Motion, as much as it points out many of these weaknesses and implausibilities, requires summary judgment.[13] A "plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but it "does not *compel* judgment for the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-48 (2000). "[T]he Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (internal quotation omitted). And Mohawk Chevrolet is correct that temporal proximity alone cannot create an issue of fact on pretext at the summary judgment stage. *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254-55 (2d Cir. 2014). A review of the record shows that, to prevail on pretext, Plaintiff must rely on disputed issues of fact, such as the alleged statement by Mohawk Chevrolet's co-owner the day before Plaintiff's termination expressing disappointment in his decision to make a sexual harassment complaint, *see* Dkt. No. 30-9 at 77:12-22. Because those issues of fact are all properly decided by

---

[12] Mohawk Chevrolet's argument that Plaintiff's pretext argument must fail because they "conducted a thorough investigation" of the sexual harassment allegations is also unconvincing, Dkt. No. 30-17 at 19—not least because, as also discussed *supra* Section IV.B, a reasonable factfinder could determine Mohawk Chevrolet's investigation was far from thorough, *see* Dkt. No. 37-1 at ¶ 47-49; *see also Kozak*, 2025 WL 1425916, at *2-3.

[13] The Court notes with concern the misattributed citations in Plaintiff's Motion, *see* Dkt. No. 34-1 at 15, which Plaintiff only recognized and corrected after Mohawk Chevrolet pointed them out, *see* Dkt. No. 42 at 4-5.

a jury, the Court must decline to grant summary judgment for Plaintiff.

Because the Court concludes that Plaintiff has established a prima facie case, and because on this record the Court cannot grant summary judgment for either party on pretext, the Court denies both Motions.

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, Dkt. No. 30, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's amended motion for summary judgment, Dkt. No. 34, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 10, 2026
Albany, New York

Anne M. Nardacci
U.S. District Judge